(No. 32610.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDWARD PRUSZEWSKI, Plaintiff in Error.

*Opinion filed March 23, 1953.*

THADDEUS C. TOUDOR, and ZOE KUTA, both of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and GEORGE J. COTSIRILOS, all of Chicago, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

Plaintiff in error, Edward Pruszewski, hereinafter called defendant, was convicted of murder in the criminal court of Cook County by a jury, on June 26, 1952, and his punishment fixed at death. On writ of error, defendant here seeks a review and a reversal, relying principally upon alleged prejudicial errors committed by the trial court in excluding competent evidence offered on his behalf.

The uncontradicted facts indicate that the defendant while attempting a reconciliation with his wife on August 10, 1948, and while engaged in sexual intercourse with his wife on the kitchen floor, reached for a knife on the kitchen sink and stabbed her repeatedly which resulted in her death.

The record discloses that the defendant had been affected with insanity for a long time; that during his service in the army, he was enrolled in three separate army and coast guard hospitals where he received treatment for a mental disorder known as schizophrenia; that he was similarly treated at the Letterman General Hospital at San Francisco, California, and, thereafter, was discharged from the army as a mental case; that, subsequently, he re-entered the coast guard and later became a patient in the mental ward of the coast guard; that, finally, he was released as a total incapacitate and his affliction diagnosed as psychosis unclassified.

On November 24, 1948, the chief justice of the criminal court of Cook County impaneled a jury to determine the sanity of the defendant, whereupon a verdict was re-

turned finding the defendant to be insane. This resulted in the commitment of the defendant to the Illinois Security Hospital at Menard. The instant indictment was stricken with leave to reinstate.

On October 11, 1951, defendant filed his sworn petition requesting a jury to determine his sanity. On December 10, 1951, a verdict was returned finding that he had recovered from his mental disease. Thereupon the indictment was reinstated and the defendant placed on trial.

The sole defense interposed by the defendant was that of insanity. The unusual and gruesome character of the killing and defendant's history of mental sickness lends much support to the claim that defendant did not possess sufficient intellect to distinguish between right and wrong on the occasion in question. Much evidence was adduced at the trial by both sides on this issue. It is strongly urged that the trial court committed reversible error in excluding the testimony of Anthony Pruszewski and Ed Pruszewski, brothers of the defendant, who as lay and nonexpert witnesses expressed an opinion that Edward Pruszewski was of unsound mind at the time of the homicide. In the presence of the jury, during the cross-examination of Anthony, the following transpired:

"The Court: Mr. State's Attorney, on the Court's own motion, the Court will sustain your previous objection that this witness express an opinion, the Court will strike out all of his testimony.

"Mr. Cotsirilos: That the jury disregard his testimony?

"The Court: The jury may disregard—he is not qualified as a witness to give an opinion, Mr. Toudor, therefore, the Court rules that not having qualified in the light of your examination, he cannot express an opinion; strike out all his testimony.

"Mr. Toudor: Exception."

As a basis for this opinion, Anthony Pruszewski had previously testified as follows: "During the year 1948 I

had occasion to see my brother from time to time. In the month of June, 1948, I noticed something peculiar about his conduct. I talked to him about his wife at times. I have known her all the time they were married. * * *. During the two months prior to August 10, 1948, he always thought she was running around with different men. As far as I know there was no basis for it. When I asked him whether he ever saw his wife going with some one else he said he thought she was going with some one else. When I asked him why he thought his wife was going with some one else, he was moody. He was always moody. He would get up parts of the night and he would say that he 'heard voices.' He used to get out of bed in the night about those voices. He just said that he heard voices in the room but he did not say what kind of voices. I slept with him in one bed. One day when I got up in the morning for work the pillow he was sleeping on was all cut up with a knife. That was two days before he killed his wife, on August 8, 1948. Besides the conduct which appeared to me to be strange, he used to drink heavily. * * * When he used to come to our home and be given food, he wouldn't eat but would sit and be moody. By saying he was moody, I mean he was thinking but would not talk to anybody. He would get up and go out. Lots of times I heard from friends or people that he'd be walking around the block just keep walking. About a day before this happened he lost his way and forgot where he lived. * * * His reaction at home when I was there or my parents were there was that he was moody, nervous, kept his head down and just sit that way. When some one would talk to him he would only make answers sometimes. When he made those answers they were not like I would answer somebody. Some time he wouldn't even answer. * * * I was present at the time he said he heard voices as I slept with him. But I did not hear any voices at that time. I have known his wife for a long time and I never noticed anything im-

proper about her conduct." Then predicating his opinion upon the foregoing observation it was his conclusion that his brother was insane on August 10, 1948. It is our opinion that this testimony was clearly admissible. It has uniformly been held that a nonexpert witness who has had an opportunity to observe the subject under inquiry may give his opinion as to his mental condition—at the same time stating the facts and circumstances as the basis for the opinion. In this case, lay witnesses, police officers and the sister of the deceased were permitted, over objection, to give their opinions that the defendant was sane. The jury has a right to know all of the facts upon which the opinion is predicated so as to adjudge its reasonableness. *People v. Krauser,* 315 Ill. 485, at p. 510; *People v. Witte,* 350 Ill. 558; *McGovern v. McGovern,* 282 Ill. 97; *Austin v. Austin,* 260 Ill. 299.

A fair analysis of the record in this case indicates that the jury could very reasonably have determined that the defendant's plea of insanity was replete with merit. The evidence on this issue was in sharp conflict. Under such circumstances it is essential that the record be free from prejudicial error. (*People v. Klapperich,* 370 Ill. 588, 19 N.E. 2d 579; *People v. Etzel,* 348 Ill. 223, 180 N.E. 789; *People v. Jarvis,* 306 Ill. 611, 138 N.E. 102.) We are not unmindful of the contention of the State that reversal should not be predicated upon trivial, theoretical or harmless rulings. The error under consideration does not belong to that category. The defendant was deprived of a fair opportunity to present fully and completely his defense. (*People v. Borella,* 362 Ill. 218, 199 N.E. 113.) The death penalty being involved makes it increasingly compelling that the defendant have another trial, one free of prejudicial error.

*Reversed and remanded.*